UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
_____

UNITED STATES OF AMERICA,

                              Plaintiff,

             v.

KALVIN PETERSON,

                              Defendant.
_____

REPORT & RECOMMENDATION

04-CR-6156L

**PRELIMINARY STATEMENT**

By Order of Hon. David G. Larimer, United States District Judge, dated August 23, 2004, all pre-trial matters in the above-captioned case have been referred to this Court pursuant to 28 U.S.C. §§ 636(b)(1)(A)-(B).  (Docket # 2).

Defendant Kalvin Peterson (hereinafter "Peterson") is charged in a two-count indictment.  The first count charges Peterson with possession of three firearms in furtherance of a drug trafficking crime, in violation of 18 U.S.C. § 924(c)(1)(A)(i).  The second count charges Peterson with possession with intent to distribute cocaine base, in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(C).  (Docket # 1).

Currently pending before this Court for report and recommendation are Peterson's motions to suppress tangible evidence and statements.[1]  (Docket # 12).  An evidentiary hearing

---

[1] Peterson's omnibus motion also sought, *inter alia*, discovery and inspection, *Brady* material, *Jencks* material, rulings on evidentiary matters under rules 404, 608 and 609 of the Federal Rules of Evidence, the preservation of rough notes and the removal of surplusage from the Indictment.  (Docket # 12).  Each of these requests was either resolved by the parties or decided in open court by the undersigned on January 28, 2005.  (Docket ## 15, 16).

was held before this Court on February 17 and April 11, 2005. (Docket ## 21, 22). Officers Michael Houlihan and Wilfredo Carbonel of the Rochester Police Department testified on behalf of the government. No witnesses were called on behalf of the defense. The following constitutes the report and recommendation of this Court.

## FACTUAL BACKGROUND

On September 4, 2003, at approximately 11:31 p.m., law enforcement officers executed a search warrant at 294 Chili Avenue, one of two apartments in a two-family residence building. (Tr.A 7, Tr.B 4).[2] Officers Carbonel and Houlihan were two of the officers who assisted in executing the warrant. During the initial entry, Carbonel was responsible for monitoring the exterior windows of the residence to ensure the safety of officers entering the premises. (Tr.B 5). Houlihan was responsible for conducting a protective sweep of the apartment for occupants or other possible threats. (Tr.A 8).

Carbonel testified that prior to the entry of 294 Chili Avenue, he looked through a stained-glass window located above the door and observed the silhouette of a person moving towards the second floor of the dwelling. (Tr.B 6). Carbonel advised the other members of the entry team that someone was running up the stairs. (Tr.B 8). The team then entered the apartment and secured its first floor. During the initial sweep, Houlihan's observed clear plastic ziplock bags with red designs that appeared to contain crack cocaine. The bags were lined up on

---

[2] The transcript of the suppression hearing conducted before this Court on February 17, 2005, shall hereinafter be referenced as "Tr.A __." (Docket # 22).
    The transcript of the suppression hearing conducted before this Court on April 11, 2005, shall hereinafter be referenced as "Tr.B __." (Docket # 21).

the arm of the couch in the downstairs living room and were plainly visible to Houlihan. (Tr.A 10).

Not finding anyone present on the first floor, the officers proceeded up the stairs. Again, the officers did not find anyone, and they moved on to search the third-floor attic. (Tr.B 9). Although they did not find any individuals in the attic, the officers discovered a hole in the wall connecting Peterson's apartment to his neighbor's. (Tr.B 9). The officers went through the hole and entered the neighboring apartment, where they encountered a female resident, Doretha Anderson. (Tr.B 11). Carbonel asked Anderson whether anyone had run through her apartment, and she indicated that an individual had run through her apartment and into the basement. (Tr.B 11, 13). The officers then entered the basement, where they discovered and apprehended Peterson. (Tr.B 12). The entire pursuit of Peterson took approximately three to four minutes. (Tr.B 13).

After both the apartment and Peterson were secured, Houlihan conducted a more thorough search of a bedroom located on the southwest corner of the second floor of 294 Chili Avenue. Among the property discovered in the bedroom were numerous plastic bags of various colors and designs, two nine-millimeter rifles and a loaded .38 caliber revolver, articles of men's clothing and paperwork addressed to Kalvin Peterson at 294 Chili Avenue. (Tr.A 10-11).

Peterson was thereafter transported to the Monroe County Public Safety Building, where he was interviewed by Houlihan and Special Agent William Clark of the Bureau of Alcohol, Tobacco and Firearms ("ATF"). (Tr.A 13, 15). Upon entering the interview room, Houlihan asked Peterson whether he needed to use the restroom or would like something to drink. Peterson requested a drink of water, which was provided to him. (Tr.A 14). The officers

then reviewed Peterson's biographical information and informed him of the severity of the charges pending against him. (Tr.A 15, 30). Specifically, Houlihan asked Peterson about his level of education, and Peterson indicated that he had attended the twelfth grade. Houlihan further questioned Peterson about whether he was intoxicated or under the influence of drugs, and Peterson replied that he was not. Finally, Houlihan asked whether he understood English and whether he could read and write. Peterson responded affirmatively. (Tr.A 18).

At that point, Houlihan told Peterson that he would like to talk to him to learn more about "his situation" to determine whether Peterson could help himself. (Tr.A 16). Specifically, Houlihan explained that some individuals facing criminal charges are able to obtain reduced sentences by working with and providing useful information to law enforcement. According to Houlihan, he informed Peterson that he could make no promises about what would happen to him. Houlihan then stated that before they could discuss that possibility further, he needed to advise Peterson of his *Miranda* rights. (Tr.A 16).

Reading from a *Miranda* card, Houlihan read the five warnings as they appeared on the card. (Tr.A 18-19, Government's Ex. ("G.Ex. ") 1). Following this reading, Houlihan asked Peterson whether he understood his rights, and Peterson replied that he did. Houlihan then asked Peterson whether, with his rights in mind, he wanted to speak with him, and Peterson responded, "Yeah." (Tr.A 19).

Houlihan and Clark then interviewed Peterson concerning the weapons discovered in his bedroom, the narcotics in his possession and his narcotics trafficking activities. (Tr.A 20). Peterson explained that he was unemployed and that the only way in which he could make money was by selling drugs. (Tr.A 20). After approximately forty-five minutes of interrogation,

Houlihan began to reduce Peterson's statement to writing. As Houlihan prepared the statement, he reviewed it with Peterson "line by line." (Tr.A 21, G.Ex. 2). Once it was completed, Houlihan provided the written statement to Peterson and asked him to read it aloud and to note any changes or deletions he wanted to make. (Tr.A 23). Peterson read the statement and noted certain corrections, which were recorded on the written statement. (Tr.A 24). After Peterson read the entire statement, Houlihan asked him whether there were any additional corrections he wished to make. Peterson indicated that there were not, and he signed the statement. (Tr.A 24-25).

According to Houlihan, the entire interview lasted approximately one hour and twenty-five minutes. Peterson was cooperative and responsive to the questions posed. He did not appear to be under the influence of drugs or alcohol, and at no time did he request the assistance of an attorney. Further, Peterson did not make any requests that were denied him. Finally, according to Houlihan, no promises or threats were made to induce Peterson to speak. (Tr.A 27-28).

## REPORT AND RECOMMENDATION

Peterson moves to suppress tangible evidence seized from his residence on the grounds that the search warrant impermissibly authorized the searching officers to enter his apartment without knocking and announcing their presence. Peterson also moves to suppress statements he made at the Public Safety Building on the grounds that the statements were the product of his illegal arrest, search and seizure and were obtained in violation of *Miranda v. Arizona*, 384 U.S. 436 (1966). (Docket # 12).

5

## I. <u>Motion to Suppress Tangible Evidence</u>

Peterson moves to suppress tangible evidence seized during the execution of a search warrant for his residence at 294 Chili Avenue.  The warrant authorized the searching officers to enter the residence without knocking and announcing their presence.  According to Peterson, the affidavit offered in support of the warrant application failed to demonstrate a particularized need for the no-knock authorization and relied only on boilerplate language.  Thus, Peterson contends, the no-knock authorization was improper, and the evidence seized should thus be suppressed.  (Docket # 12).

Under New York Criminal Procedure Law § 690.35(4)(b), an officer may request authorization to enter a premises without first knocking or announcing his or her presence upon a showing of reasonable cause to believe that the property sought in the warrant may be easily and quickly destroyed or disposed of, or that the safety of the officer or another would be endangered by the giving of such notice.  *See United States v. Ramirez*, 523 U.S. 65, 71 (1998) ("a no-knock entry is justified if police have a 'reasonable suspicion' that knocking and announcing would be dangerous, futile, or destructive to the purposes of the investigation") (citing *Richards v. Wisconsin*, 520 U.S. 385, 394-95 (1997)); *Wilson v. Arkansas*, 514 U.S. 927, 936 (1995) ("although a search and seizure of a dwelling might be constitutionally defective if police officers enter without prior announcement, law enforcement interests may also establish the reasonableness of an unannounced entry").  While the Fourth Amendment does not permit a blanket exception to the knock and announce requirement for felony drug investigations, *Richards*, 520 U.S. at 394, the requirement may be excused where there exists "a reasonable suspicion that knocking and announcing their presence, under the particular circumstances,

would be dangerous or futile, or that it would inhibit the effective investigation of the crime by, for example, allowing the destruction of evidence." *Id.*

This Court has reviewed the affidavit of Officer Edmond D. Bernabei that was submitted in support of the application for the search warrant for 294 Chili Avenue. (Docket # 12, Ex. B ("Bernabei Aff.")). In the affidavit, Bernabei described two controlled purchases of narcotics that had been made from Peterson's apartment, the latter occurring the day before the issuance of the warrant. Specifically, Bernabei affirmed that on August 22, 2003, at approximately 3:27 p.m., he and Officer Pearce met with a confidential informant for the purpose of conducting a controlled purchase of narcotics from 294 Chili Avenue. Bernabei knew the informant and affirmed that the informant previously had provided reliable information that had led to arrests and the recovery of illegal narcotics. According to Bernabei, the informant ("CI-1") was initially searched to ensure that he or she was not in possession of contraband. CI-1 was then provided with $10 cash and driven in an undercover police vehicle to the area of 294 Chili Avenue. At approximately 3:40 p.m., Bernabei observed CI-1 walk to the eastern side of 294 Chili Avenue. Approximately two minutes later, he observed CI-1 walk away from the location and directly to the undercover police vehicle. After returning, CI-1 handed Bernabei a clear ziplock bag containing a white, rock-like substance, later determined to contain cocaine. (Bernabei Aff. ¶ 4).

Consistent with Bernabei's observations, CI-1 reported encountering a black male at the door of 294 Chili Avenue. According to CI-1, the male had braided hair, was approximately five feet, nine inches tall, twenty-eight years old and 180 pounds. CI-1 requested to purchase a dime bag of cocaine and provided the male with $10, in exchange for which the

male provided CI-1 with a plastic bag containing a white, rock-like substance. (Bernabei Aff. ¶ 4).

The second controlled purchase of narcotics referenced by Bernabei occurred on September 3, 2003. On that date, at approximately 9:28 p.m., Bernabei and Pearce met with the same informant in order to make another controlled purchase from 294 Chili Avenue. Once again, they searched CI-1 to ensure that the informant did not possess contraband. CI-1 was then provided with $10 in cash and driven to the area of 294 Chili Avenue. Bernabei observed the informant walk directly towards that location. Approximately five minutes later, CI-1 walked away from 294 Chili Avenue and returned directly to the undercover police car. In the car, CI-1 provided Bernabei a clear plastic bag containing a white, rock-like substance, later determined to contain cocaine. (Bernabei Aff. ¶ 4).

As with the earlier transaction, CI-1 reported to Bernabei the details of the purchase of a dime bag of cocaine. CI-1 described the purchase of narcotics from a black male, who was wearing a white tank-top shirt and blue jeans, whom the informant had encountered at the door of 294 Chili Avenue. CI-1 asked the male for one dime bag, and the male entered the house. When he returned, CI-1 paid him $10, and the male gave the informant the plastic bag of cocaine. (Bernabei Aff. ¶ 4).

Based upon the above facts, Bernabei asserted in his affidavit that probable cause existed to believe that evidence relating to narcotics trafficking would be discovered in Peterson's apartment. (Bernabei Aff. ¶ 3). The affidavit requested the issuance of a no-knock warrant because:

> a) The property sought to be seized may be easily and quickly disposed of or destroyed. Based on your deponent's experience,

>dealers of controlled substances and/or marijuana often flush said substances down the toilet or have predetermined hiding places in order to keep said substances from being seized by executing Police Officers.
>
>b) The giving of such notice may endanger the life or safety of the executing Police Officer or that of a third person because of the fact that persons involved in the sales of cocaine normally are in possession of weapons to guard the substance possessed. Therefore, I request a no-knock warrant.

(Docket # 12, Ex. B).

Peterson does not challenge the warrant's authorization to search his residence for narcotics. Rather, he claims that Bernabei's affidavit was insufficient to justify the authorization to enter without knocking and announcing. According to Peterson, the affidavit did not demonstrate a particularized need for the no-knock entry because it relied only upon boilerplate language.

Peterson's argument is essentially identical to a contention rejected in a recent decision by the Hon. Charles J. Siragusa, United States District Judge. *See United States v. Linder and United States v. Chisolm*, Nos. 03-CR-6116 and 03-CR-6181, slip op. (W.D.N.Y. Jan. 24, 2005). In that decision, Judge Siragusa reviewed search warrants authorizing no-knock entries that had been issued upon affidavits describing multiple controlled purchases of narcotics from the residences to be searched. The affidavits requested the no-knock authorization based upon the affiants' opinions that knocking and announcing would be dangerous because, in their view, informed by their law enforcement training and experience, weapons are often present where narcotics trafficking activities occur and narcotics dealers often destroy, dispose of or hide the narcotics to avoid seizure by law enforcement. Like Judge Siragusa, I am inclined to believe that the affidavit submitted to the issuing judge was insufficient to warrant no-knock

9

authorization on the grounds of dangerousness, but was sufficient to justify such authorization on the grounds that the narcotics sold from that location could easily have been destroyed or discarded if the officers announced their entry. *See*, *e.g.*, *Rodriguez v. Butler*, 536 F.2d 982, 987 (2d Cir. 1976) ("[a]rguably the presence of easily disposable contraband without more constitutes a sufficient exigency to justify no-knock entry"), *cert. denied*, 429 U.S. 943 (1976); *United States v. Bynum*, 362 F.3d 574, 581 (9th Cir. 2004) (no-knock entry justified due to the "disposable nature of drugs"); *United States v. Peterson*, 353 F.3d 1045, 1050 (9th Cir 2003) (no-knock entry was justified by suspected presence of narcotics, which are "the quintessential disposable contraband"); *United States v. Kennedy*, 32 F.3d 876, 882 (4th Cir. 1994) (reasonable to assume that experienced narcotics dealers would attempt to destroy evidence unless officers acted quickly), *cert. denied*, 513 U.S. 1128 (1995); *United States v. Moore*, 956 F.2d 843, 850 (8th Cir. 1992) (reasonable to assume suspects selling narcotics in small quantities would attempt to destroy evidence).

   I need not make such a determination, however, because I find – as Judge Siragusa did – that the searching officers were allowed to rely in good faith upon the no-knock provision. In *United States v. Leon*, 468 U.S. 897 (1984), the Supreme Court held that the Fourth Amendment exclusionary rule should not be applied to evidence obtained by a police officer whose reliance on a search warrant issued by a neutral magistrate was based on "objective good faith," even though the warrant itself might ultimately be found to be defective. *Id.* at 918-23; *United States v. Salameh*, 152 F.3d 88, 114 (2d Cir. 1998), *cert. denied*, 525 U.S. 1112 (1999); *United States v. Benedict*, 104 F. Supp. 2d 175, 182 (W.D.N.Y. 2000). The rationale underlying

this good-faith exception is that the exclusionary rule "cannot be expected, and should not be applied, to deter objectively reasonable law enforcement activity." *Leon*, 468 U.S. at 919.

The Court in *Leon* identified four situations in which the good faith exception is inapplicable. Specifically, an executing officer's reliance on a search warrant will not be deemed to have been in good faith:

> (1) where the issuing magistrate had been knowingly misled;
>
> (2) where the issuing magistrate wholly abandoned his or her judicial role;
>
> (3) where the application is so lacking in indicia of probable cause as to render reliance upon it unreasonable; and
>
> (4) where the warrant is so facially deficient that reliance upon it is unreasonable.

*Id.* at 923. *See United States v. Cancelmo*, 64 F.3d 804, 807 (2d Cir. 1995) (citations omitted). Here, Peterson has not alleged – nor has he submitted any evidence to suggest – that the issuing court was knowingly misled, that it abandoned its neutral role, or that the warrant was facially deficient. Rather, Peterson apparently contends that the affidavit, by relying upon boilerplate language, was so lacking in probable cause as to render reliance upon it unreasonable. This Court disagrees.

In *United States v. Tisdale*, 195 F.3d 70, 72-73 (2d Cir. 1999), the Second Circuit applied the good faith exception to a warrant containing a no-knock authorization.[3] The warrant in that case, as noted by the Second Circuit, coupled with the issuing court's interview of the informant, depicted several recent controlled purchases of narcotics from the location to be

---

[3] In *Tisdale*, the Second Circuit noted that the statutory text of New York's no-knock provision did not conflict with the constitutional requirements set forth in *Richards*, 502 U.S. at 394, which invalidated any blanket no-knock rules. 195 F.3d at 73.

searched. On that record, the issuing court authorized a no-knock entry. Upon review, the Second Circuit concluded that regardless of the ultimate validity of the warrant, the searching officers had the right to reasonably rely upon it because the supporting affidavit "point[ed] to the existence of particularized exigent circumstances," namely, the readily disposable form of narcotics being distributed from that location. *Id*. at 73. Nothing in that opinion suggests that the Second Circuit's reasoning would not apply to the facts before this Court, arising as they have several years after the *Tisdale* decision.

In this case, Bernabei's affidavit provided information regarding multiple recent controlled purchases by a confidential informant of cocaine packaged in small clear bags, evidence that could be easily discarded. This information, taken together with Bernabei's opinion concerning the ease and speed with which controlled substances may be disposed of or secreted, provided a sufficient basis for the executing officers to rely reasonably upon the issuing court's determination that the no-knock authorization was justified. Accordingly, it is my recommendation that Peterson's motion to suppress tangible evidence be denied.

## II. **Motion to Suppress Statements**

Peterson also moves to suppress statements made by him to Officer Houlihan and Special Agent Clark. Peterson's motion is based upon two independent grounds. First, Peterson argues that his statements should be suppressed as the fruit of an impermissible Fourth Amendment seizure. Second, Peterson argues his statements were obtained in violation of *Miranda*. (Docket # 12).

      **A. <u>Lawfulness of Peterson's Arrest</u>:** In a single sentence, Peterson summarily asserts that his statements were the "unauthorized by-product of the illegal search, seizure, and interrogation of [him] pursuant to *Dunaway v. New York*, 442 U.S. 200 (1979); and, [were] the fruit of the poisonous tree pursuant to *Wong Sun v. United States*, 371 U.S. 471 (1963)." (Docket # 12 at 10).

      In *Michigan v. Summers*, 452 U.S. 692, 704-05 (1981), the Supreme Court held that officers executing a search warrant may detain the occupants of the premises during the course of the search. *See, e.g.*, *Rivera v. United States*, 928 F.2d 592, 606 (2d Cir. 1991) ("[a]bsent special circumstances, the police of course have the authority to detain occupants of premises while an authorized search is in progress"); *Crosby v. Hare*, 932 F. Supp. 490, 493 (W.D.N.Y. 1996) (occupant held naked in shower at gunpoint and then handcuffed while dressing found not to have been unlawfully seized during execution of search warrant); *Howard v. Schoberle*, 907 F. Supp. 671, 677 (S.D.N.Y. 1995) ("decision to handcuff plaintiffs after the police entered the apartment was undeniably lawful"). Such detention is justified in order to ensure officer safety, prevent flight in the event that incriminating evidence is discovered and facilitate the orderly completion of the search. *Michigan v. Summers*, 452 U.S. at 702-03.

      Here, I find that the officers were justified in searching for Peterson when they entered the apartment and pursuing him through the hole in the attic into the basement of the adjoining apartment. The exigencies presented by the sudden flight of an occupant from an apartment in the process of being searched and, through a hole in the wall, into the adjoining apartment warranted the officers' pursuit and detention of that occupant – in this case, Peterson. On these facts, I determine that the officers' concern, as articulated by Carbonel, that Peterson

might have been attempting to remove evidence or to access weapons for use against the officers (Tr.B 23) was reasonable and justified his detention. *See*, *e.g.*, *United States v. Young*, 909 F.2d 442, 446 (8th Cir. 1990) (exigent circumstances justified the search and detention of defendant as she attempted to flee through rear door of premises), *cert. denied*, 502 U.S. 825 (1991); *United States v. Nelson*, 931 F. Supp. 194, 202 (W.D.N.Y. 1996) (officers preparing to execute search warrant justified in searching defendant who was observed leaving the premises through basement window), *aff'd*, 131 F.3d 132 (2d Cir. 1997).

I further find that Peterson's subsequent arrest following the search was supported by probable cause in view of the narcotics discovered in the living room, the weapons and packaging materials discovered in the bedroom, the documents discovered linking Peterson to 294 Chili Avenue, his flight from the apartment and the prior purchases from that location. *See United States v. Fisher*, 702 F.2d 372, 375 (2d Cir. 1983) (probable cause to arrest exists when the authorities "have knowledge or reasonably trustworthy information of facts and circumstances that are sufficient in themselves to warrant a person of reasonable caution in the belief that (1) an offense has been or is being committed (2) by the person to be arrested"); *see also United States v. Patrick*, 899 F.2d 169, 171 (2d Cir. 1990) (citing *Brinegar v. United States*, 338 U.S. 160, 175-76 (1949)); *United States v. Jenkins*, 876 F.2d 1085, 1089 (2d Cir. 1989). Because I find that Peterson's arrest, which occurred before he was questioned, was lawful, I recommend that Peterson's motion to suppress his subsequent statements as the fruit of an illegal arrest be denied.

**B. Reading of the *Miranda* Rights:** In his final motion, Peterson claims that his statements should be suppressed because he had not previously been advised of his *Miranda*

14

rights.  The government opposes such motion, arguing that Peterson made a knowing and voluntary waiver of such rights.

It is, of course, well-settled that statements made during custodial interrogation are generally inadmissible unless a suspect first has been advised of his rights pursuant to *Miranda v. Arizona*, 384 U.S. 436 (1966).  In *Miranda*, the Supreme Court held that the prosecution may not use a defendant's statements that are the product of custodial interrogation unless it demonstrates that the defendant was first warned of his Fifth Amendment privilege against self-incrimination and then voluntarily waived that right.  *Id.* at 444.

"'Interrogation,' as conceptualized in the *Miranda* opinion, must reflect a measure of compulsion above and beyond that inherent in custody itself." *Rhode Island v. Innis*, 446 U.S. 291, 300 (1980).  Interrogation includes direct questioning, as well as "any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect," *Innis*, 446 U.S. at 301, or that would "produce psychological pressures that [would] subject the individual to the 'will' of his examiner." *United States v. Morales*, 834 F.2d 35, 38 (2d Cir. 1987) (citations omitted).  *See also United States v. Montana*, 958 F.2d 516, 518 (2d Cir. 1992); *United States v. Thomas*, 961 F. Supp. 43, 44-45 (W.D.N.Y. 1997).

Houlihan's testimony before this Court demonstrates that Peterson was advised of his *Miranda* rights and voluntarily agreed to waive them.  Specifically, Houlihan testified that when he entered the interview room, he initially asked Peterson whether he needed to use the restroom or wanted something to drink.  Peterson requested a drink of water, which was provided to him.  (Tr.A 14).  After reviewing his pedigree information, Houlihan and Special Agent Clark

advised Peterson of the severity of the charges pending against him.  (Tr.A 15, 30).  Houlihan further testified that he stated to Peterson that he wanted to talk to him about the possibility of assistance and cooperation, noting that he could make no promises.  (Tr.A 15, 28-31).  Specifically, Houlihan explained that "there's instances where people can sometimes, if they have information or they have people that they can provide information on, sometimes we can work contracts out with them and they can sometimes reduce the sentence or wind up getting probation."  (Tr.A 31).  At that point, Houlihan told Peterson that he needed to advise him of his *Miranda* rights.  (Tr.A 16).

Houlihan then used a *Miranda* card and read the rights to Peterson as they appeared on the card.  (Tr.A 18-19, G.Ex. 1).  Following this reading, Houlihan asked Peterson whether he understood his rights and whether, with such rights in mind, he wanted to speak with him.  Peterson responded affirmatively to both questions.  (Tr.A 19).  During the subsequent interview, Houlihan and Clark questioned Peterson regarding the firearms and narcotics discovered in his apartment and his narcotics trafficking activities.  (Tr.A 20).  Peterson's statements were eventually reduced to a written statement, which was drafted by Houlihan and reviewed by Peterson.  After making certain changes to the written statement, Peterson read the entire statement aloud and signed it.

According to Houlihan, throughout the interview Peterson was responsive to his questions and did not appear to be intoxicated or under the influence of any controlled substance.  At no time, Houlihan testified, did Peterson make a request that was denied him, nor were any promises or threats made to Peterson in order to induce him to speak.  (Tr.A 27-28).

On this record, I find that Peterson was advised of his rights pursuant to *Miranda* and that he knowingly and voluntarily waived those rights. That the officers discussed the possibility of cooperation with him, without making false assurances, does not alter my finding. *See*, *e.g.*, *United States v. Jaswal*, 47 F.3d 539, 542 (2d Cir. 1995) (voluntariness of *Miranda* waiver "was not vitiated by any assurance that cooperation would help defendant"); *United States v. Bye*, 919 F.2d 6, 7 (2d Cir. 1990) (discussion of potential sentence defendant was facing and possible benefits of cooperation did not render *Miranda* waiver involuntary). Accordingly, this Court recommends denial of Peterson's motion to suppress statements that he made to Houlihan on the grounds that they were obtained in violation of *Miranda*.

## CONCLUSION

For the foregoing reasons, it is my report and recommendation that defendant's motions to suppress physical evidence seized from his apartment **(Docket # 20)** be **DENIED**. It is my further recommendation that defendant's motion to suppress statements made by him on the grounds that they were the fruit of an unlawful arrest and were obtained in violation of *Miranda* **(Docket # 20)** be **DENIED**.

s/Marian W. Payson
MARIAN W. PAYSON
United States Magistrate Judge

Dated: Rochester, New York
June 13, 2005.

Pursuant to 28 U.S.C. § 636(b)(1), it is hereby

**ORDERED**, that this Report and Recommendation be filed with the Clerk of the Court.

**ANY OBJECTIONS** to this Report and Recommendation must be filed with the Clerk of this Court within ten (10) days after receipt of a copy of this Report and Recommendation in accordance with the above statute and Rule 58.2(a)(3) of the Local Rules of Criminal Procedure for the Western District of New York.[4]

The district court will ordinarily refuse to consider on *de novo* review arguments, case law and/or evidentiary material which could have been, but was not, presented to the magistrate judge in the first instance. *See, e.g., Paterson-Leitch Co., Inc. v. Massachusetts Mun. Wholesale Elec. Co.*, 840 F.2d 985 (1st Cir. 1988).

**Failure to file objections within the specified time or to request an extension of such time waives the right to appeal the District Court's Order.** *Thomas v. Arn*, 474 U.S. 140 (1985); *Small v. Secretary of Health and Human Services,* 892 F.2d 15 (2d Cir. 1989); *Wesolek v. Canadair Ltd.,* 838 F.2d 55 (2d Cir. 1988).

The parties are reminded that, pursuant to Rule 58.2(a)(3) of the Local Rules of Criminal Procedure for the Western District of New York, "written objections shall specifically identify the portions of the proposed findings and recommendations to which objection is made and the basis for such objection and shall be supported by legal authority." **Failure to comply with the provisions of Rule 58.2(a)(3) may result in the District Court's refusal to consider the objection.**

Let the Clerk send a copy of this Order and a copy of the Report and Recommendation to the attorneys for the parties.

**IT IS SO ORDERED.**

    s/Marian W. Payson
    MARIAN W. PAYSON
    United States Magistrate Judge

Dated: Rochester, New York
       June 13, 2005.

---

[4] Counsel is advised that a new period of excludable time pursuant to 18 U.S.C. § 3161(h)(1)(F) commences with the filing of this Report and Recommendation. Such period of excludable delay lasts only until objections to this Report and Recommendation are filed or until the ten days allowed for filing objections has elapsed. *United States v. Andress*, 943 F.2d 622 (6th Cir. 1991); *United States v. Long*, 900 F.2d 1270 (8th Cir. 1990).